

CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED
JUL 2 2 2008
JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| KIM C. DANIEL, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 6:07cv020 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant | ) |

### REPORT AND RECOMMENDATION

Plaintiff Kim C. Daniel ("Daniel") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits under the Social Security Act ("Act"). This case presents two issues on appeal. The first is whether the Commissioner committed errors of law by not properly addressing the opinions of Daniel's treating physicians, Drs. Joseph Wombwell and Charles Shuff. The second is whether the Commissioner erred in evaluating Daniel's credibility and her subjective complaints of pain. The Administrative Law Judge ("ALJ") did not adequately address the opinion of Daniel's treating physician, Dr. Wombwell. Further, the ALJ's failure to appropriately analyze Daniel's subjective complaints of disabling pain due to her osteoarthritis constitutes legal error. For these reasons the undersigned recommends remanding this matter for further administrative consideration.

### I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d

171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security

benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. Id. Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functioning capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Daniel, born in 1971, was a younger individual on the alleged onset date of November 3, 2004. Daniel completed the eleventh grade and can read and write English. (Administrative

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g. pain). See 20 C.F.R. § 404.1529(a).

Record, hereinafter "R." at 219) Prior to the alleged onset date, Daniel worked as an assistant manager at a fast food restaurant where she supervised seven to eight employees. (R. 341-42) On November 3, 2004, the alleged onset date, Daniel was involved in an automobile accident. (R. 223) Injuries suffered as a result of this accident form the basis of her application for benefits. (R. 341)[2] Daniel alleges disability due to back and leg pain. (R. 85)

Immediately following the accident, Daniel was taken to the emergency room at Lynchburg General Hospital. She complained of back and neck pain at that time. (R. 223) Daniel went back to Lynchburg General Hospital on November 5, 2004 with back, bilateral shoulder, and neck pain. (R. 215) On November 12, 2004, a little over a week after the accident, Daniel was referred to physical therapy. (R. 180) She began physical therapy on November 18, 2004 for her back pain, decreased range of motion, and decreased functioning, and was to attend physical therapy two to three times a week for four weeks. (R. 173-179) On December 3, 2004, Dr. Wombwell referred Daniel to physical therapy two to three times a week for an additional five weeks because of the moderate progress being made. (R. 160, 172) On January 5, 2005, Daniel's physical therapist again suggested extending her period of physical therapy. (R. 152) Dr. Wombwell again complied and referred her to two to three physical therapy sessions a week for an additional month. (R. 171) On February 7, 2005, Dr. Wombwell extended Daniel's physical therapy for another four weeks and released her to perform "part-time work, if available." (R. 170, 258) Throughout this period, Daniel's pain symptoms improved moderately. (R. 258)

---

[2] When Daniel was eleven years old she had a Harrington rod surgically placed in her spine due to scoliosis, but there is no indication in the record of any complications from this surgery. Daniel's alleged onset date comes more than twenty years after the surgery and is a direct result of the automobile accident.

Daniel returned to Dr. Wombwell on March 15, 2005 and she stated that "she has improved and her pain is starting to subside," but she did not return to work part-time as there was no part-time work available. (R. 256) As a result of this visit, Daniel was released to return to work full-time. (R. 256)

On April 1, 2005, Dr. Shuff, an orthopaedic surgeon, saw Daniel on referral from Dr. Wombwell. (R. 191-192) Daniel was referred to Dr. Shuff to determine whether a problem with the Harrington rod implanted in her as a child was impeding her recovery from the accident. (R. 191) Based on a review of Daniel's x-rays and a bone scan, Dr. Shuff opined that the Harrington rod was still functioning properly and recommended conservative treatment including continued therapy, medication, rest, and anti-inflammatory medication. (R. 192)

On May 10, 2005, Dr. Wombwell again saw Daniel. (R. 256) Upon examination and projectional radiography of the right hip, Dr. Wombwell diagnosed "moderate osteoarthritis with a femoral neck deformity related to her previous slipped epiphysis." (R. 256) Dr. Wombwell noted that "[i]t does not appear that [Daniel] is able to perform any significant work activity at this time due to her low back and hip symptoms." (R. 256) Dr. Wombwell also filled out a physical limitations assessment for Daniel during this visit. (R. 260-262)

The physical limitations assessment completed by Dr. Wombwell on May 10, 2005 restricted Daniel to lifting 10 pounds, standing/walking less than two hours, and sitting from four to less than six hours. (R. 260) Dr. Wombwell also opined that Daniel could only sit for two hours uninterrupted and could never stoop, climb, balance, crouch, kneel, or crawl and could occasionally push/pull. (R. 261) Because of these limitations, Dr. Wombwell believed Daniel to be "[d]isabled from substantial work activity." (R. 262) As support for this assessment, Dr. Wombwell noted Daniel's osteoarthritis of the spine and right hip. (R. 262)

On September 1, 2005, Daniel was seen by Dr. Margaret Adeniji for an initial patient intake. (R. 290) Dr. Adeniji diagnosed Daniel with right hip pain, hypertension, and right axillary hydradenitis. (R. 290) On March 14, 2006, Daniel was admitted to the emergency room of Lynchburg General Hospital where she was diagnosed with bronchitis. (R. 298) The treatment notes from this visit note lower back pain and pain radiating from her right hip. (R. 298)

Daniel was seen by Dr. Wombwell on March 17, 2006. (R. 293) Lisa Best, Dr. Wombell's Certified Physician Assistant ("PA-C"), completed a patient evaluation on March 17, which was initialed by Dr. Wombwell on March 22, 2006. (R. 293) The notes from this visit indicate that Daniel was suffering from pain that "starts posterolateral from the buttock and radiates down to the bottom of the foot." (R. 293) She also complained of lower back and right hip pain. (R. 293) Upon physical examination, Dr. Wombwell noted that "[e]xamination of the right leg reveals that she has pain with internal and external rotation of the hip. Straight leg raising is mildly positive. . . . She has lower lumbar pain with extension of the lumbar spine. She has limited lumbar flexion." (R. 293) X-rays taken at the time revealed moderate degenerative changes. (R. 293) Dr. Wombwell and PA-C Best believed Daniel's "history and physical exam were most consistent with radiculitis." (R. 293) Daniel's was injected with 2 cubic centimeters ("cc") of Depo Medrol and given a refill for Lortab. (R. 293)

Daniel followed-up with Dr. Wombwell on March 31, 2006, and reported that the pain in her leg had "improved somewhat." (R. 292) Her chief complaint during this visit was pain in her right hip, and her treatment notes acknowledge a history of osteoarthritis. (R. 292) The notes also reveal that she occasionally uses a cane for ambulation. (R. 292) Physical examination revealed that Daniel "can demonstrate moderate lumbar flexion. She has limited lumbar

6

extension, which does cause some pain. There is tenderness over the anterior aspect of the right hip. Flexion allowed to 90 degrees. She has about 20 degrees of internal, though 40 degrees external rotation. There is pain with extremes." (R. 292) Dr. Wombwell diagnosed lumbar pain and osteoarthritis of the right hip and prescribed Voltaren. (R. 292) He also noted that "[i]t may come to a hip replacement someday. It did not appear that she is capable of performing any work activity requiring any standing or walking." (R. 292)

Daniel saw Dr. Wombwell again on June 14, 2006. (R. 332) The June 14 visit dealt primarily with a complaint of pain in her right shoulder, but Dr. Wombwell also noted "[s]he does have continued pain in both of her hips, particularly on her right side. She has had Lortab for pain." (R. 332) On June 26, 2006, Dr. Wombwell completed another Physical Limitations Assessment for Daniel, which mirrored his May 5, 2005 assessment. (R. 324-26) Notably, Dr. Wombwell asserted that Daniel's condition was unchanged from the May 5, 2005 assessment. (R. 326)

Daniel's final visit to Dr. Wombwell occurred on October 9, 2006. (R. 333-36) While this visit occurred after the ALJ's opinion, it is relevant to the extent that it relates back to the time period at issue. Importantly, Dr. Wombwell noted that "[p]revious x-rays have shown osteoarthritis of her right hip." (R. 335) Dr. Wombwell noted, as he did in previous treatment notes, that "[s]he may come to a hip replacement at some point." (R. 335)

In determining whether Daniel was disabled under the Act, the ALJ found that she suffered from severe muscoskeletal impairments. (R. 18) Despite this finding, however, the ALJ found that Daniel did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."

7

(R. 19) The ALJ found that Daniel had the residual functional capacity ("RFC") "to perform a wide range of unskilled work at the sedentary level of exertion." (R. 20) The ALJ opined that:

> The claimant requires a low stress work environment, but has adequate concentration and mental functioning to perform simple repetitive tasks on a regular basis. She can lift/carry ten pounds, can stand/walk about two hours in an eight hour workday, and can sit about six hours in an eight hour workday. The claimant can occasionally climb, stoop, kneel, crouch, and crawl and has no other significant postural, manipulative, visual, communicative, or environmental limitations.

(R. 20) In making this determination, the ALJ concurred with the opinion of Dr. Wombwell, but only to the extent that it did not preclude sedentary work. (R. 21) Earlier in the opinion, the ALJ acknowledged that the limitations delineated by Dr. Wombwell would preclude even sedentary work. (R. 17) The ALJ disregarded the portions of Dr. Wombwell's limitations that would preclude sedentary work because they "lack support and consistency with the other evidence, including Dr. Wombwell's own treatment records." (R. 21) In discussing the reasons for disregarding Dr. Wombwell's opinion, the ALJ states:

> Repeated physical examinations, including recent examinations in March 2006, have revealed intact strength and sensation in the bilateral lower extremities. It is reported in the March 15, 2005, treatment note that the claimant was improved with subsiding pain. No part time work was reportedly available at that time; and, Dr. Wombwell released the claimant to full time work. Only occasional use of a prescribed pain analgesic was recommended; and, there is no evidence of further followup after May 2005 until March 2006. These factors suggest a lesser degree of pain and functional limitations than indicated by Dr. Wombwell's assessments.

(R. 21-22)

The ALJ afforded considerable weight to the opinions of two non-examining state agency physicians whose opinions were consistent with the ALJ's RFC finding. (R. 22) The state agency physicians completed RFC assessments on July 13 and 14, 2005. (R. 286) In affording

considerable weight to their opinions, the ALJ recognized that the state agency physicians were not treating physicians, but that "they are experts in all phases of disability evaluation and are well-qualified to render an opinion regarding the nature and severity of the claimant's impairments. Their conclusions are found to be consistent with and supported by the other evidence of record." (R. 22) The RFC assessments completed by the state agency physicians opine that Daniel "alleges disability due to a rod in the back and scoliosis." (R. 285) The state agency physicians make only a passing reference to Dr. Wombwell's diagnosis of osteoarthritis of the right hip and spine, (R. 285), which forms the basis of Daniel's claim of disability.

## III.

An ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527(d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why she discounted a

9

physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

The ALJ's discussion of Dr. Wombwell's disability opinion does not meet the Mastro standard. The ALJ rejects Dr. Wombwell's opinion largely because he finds it to be inconsistent with his treatment records. In doing so, the ALJ appears to rely upon Dr. Wombell's March 15, 2005 treatment notes which release Daniel to full-time work. This reliance is misplaced for two reasons. First, the ALJ ignores the substance of later treatment notes from May 10, 2005, the date the disability opinion was rendered. Second, the decision appears to confuse the March and May, 2005 treatment visits. The ALJ's decision states that "[t]he claimant was reported to be improved with subsiding pain in May 2005 and was released to return to work." (R. 21) This is plainly incorrect. While the March records reflected some improvement, Dr. Wombwell's treatment notes from May 10, 2005 actually state that Daniel "has not been able to perform her work activity due to pain in her back as well as her hip." (R. 256) Dr. Wombwell further opined on May 10, 2005 that "[i]t does not appear that she is able to perform any significant work activity at this time due to her low back and hip symptoms." (R. 256) Importantly, this visit was the first time that Dr. Wombwell diagnosed Daniel with osteoarthritis based on objective testing. (R. 256) The ALJ's opinion apparently confuses Dr. Wombwell's March 15 and May 10, 2005 treatment notes, and simply ignores the treatment notes from May 10, 2005. The ALJ's failure to consider the May 10,

10

2005 treatment notes calls into doubt his conclusion that Dr. Wombwell's disability opinion was not consistent with his notes, and the case must be remanded for a more complete evaluation of the medical records. This is especially true in this case as the treatment notes ignored by the ALJ are from the visit on the very day the disability opinion was rendered. In sum, the ALJ's confusion regarding the March and May 2005 treatment notes and the failure to address the substance of the May, 2005 notes requires remand.

Second, the ALJ affords Dr. Wombwell's opinion less than controlling weight because "[o]nly occasional use of a prescribed pain analgesic was recommended; and there is no evidence of further followup after May 2005 until March 2006." (R. 21-22) The treatment notes, however, indicate that Daniel was prescribed Darvocet (R. 88, 107, 128, 135, 256), Voltaren (R. 292), Diclofenac (R. 133), Flexeril (R. 174), and Lortab (R. 133, 135, 174, 293, 332) starting January 7, 2005 and continuing through March 31, 2006. Additionally, Dr. Wombwell injected her with Depo-Medrol during visits. (R. 257, 293) Thus, the ALJ's reliance on the fact that only occasional use of prescribed pain analgesics was recommended is not supported by the medical evidence of record. Additionally, the ALJ's discrediting of Dr. Wombwell's opinion based on a lack of treatment from May 2005 through March 2006 is irrelevant as the Physical Limitations Assessment completed by Dr. Wombwell on June 26, 2006 is exactly the same as the May 10, 2005 assessment. Daniel's condition did not change through this time period and her pain was somewhat managed with prescription medication. Had Dr. Wombwell's June 26, 2006 assessment revealed significant improvement in Daniel's condition, then the ALJ would have been justified in relying upon the lack of treatment for this time period. Because such improvement is noticeably absent from the record, however, the ALJ should not have relied upon this as evidence to discredit Dr. Wombwell's opinion.

11

As a result, the undersigned finds that the ALJ's evaluation of Dr. Wombwell's disability opinion to be inconsistent with the mandates of the social security regulations and Mastro. Accordingly, the undersigned finds that the ALJ's opinion is not supported by substantial evidence.

## IV.

The undersigned also finds that the ALJ applied an improper legal standard in evaluating Daniel's subjective claims of pain and her credibility. It is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Accordingly, the ALJ is not required to accept Daniel's subjective allegation that she is disabled by pain, but rather must determine, through an examination of the objective medical record, whether she has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers.").

In determining whether a claimant is disabled by pain, the Fourth Circuit mandates a two step process. Hines v. Barnhart, 453 F.3d 559, 564-66 (4th Cir. 2006). First, the claimant must show, with medically objective evidence, that she suffers from an impairment that could be reasonably expected to cause pain. Id. Once such a showing is made, the claimant is entitled to rely exclusively on subjective evidence "to prove the second part of the test, *i.e.*, that [her] pain is continuous and/or severe that it prevents [her] from working a full eight hour day." Id. at 565. Objective evidence, while not necessary to prove disabling pain at the second step, can still serve to counter the claimant's allegations of subjective pain. Id. at 565 n.3 (citing Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996)).

12

**A.**

Daniel has sufficiently satisfied the first requirement of the Fourth Circuit standard by showing that she has been diagnosed with osteoarthritis. In making this diagnosis, Dr. Wombwell examined projectional radiography of the right hip and determined that "she does have moderate osteoarthritis with a femoral neck deformity related to her previous slipped epiphysis." (R. 256) Osteoarthritis is defined as "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." Dorland's Illustrated Medical Dictionary 1333 (30th Ed. 2003). Accordingly, Daniel's diagnosis of osteoarthritis is supported by objective medical evidence and is an impairment that could be reasonably expected to cause pain. Hines, 453 F.3d at 564-65.

**B.**

In Hines, the Fourth Circuit held that the ALJ's decision was not supported by substantial evidence, because the ALJ improperly discredited the opinion of the claimant's treating physician that the claimant was totally disabled. Id. at 563. In so holding, the Fourth Circuit determined that the ALJ improperly required objective medical evidence of pain, rather than crediting the subjective testimony of the claimant, his wife, and his friend, which were uncontradicted in the record. Id. at 563-66. The claimant in Hines adequately demonstrated by objective medical evidence that he suffered from Sickle Cell Disease. Id. at 565. The Fourth Circuit held that the ALJ committed error by noting that no objective evidence existed of "end-organ damage to Mr. Hines' kidneys or bones, neurological deficits, swollen joints or extremities, muscle atrophy, or decreased range of motion in Mr. Hines' joints. The ALJ applied an incorrect legal standard when

13

he required objective evidence of pain. Essentially, the ALJ required objective evidence that Mr. Hines' pain was so intense as to prevent him from working an eight hour day. This was in error." Id. at 563.

In Hines, the Fourth Circuit held that ALJ committed error by discrediting the claimant's testimony about his pain as inconsistent with his testimony about his daily activities. Hines, 453 F.3d at 565. The court noted that this "conclusion is not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two. The ALJ selectively cited evidence concerning tasks which Mr. Hines was capable of performing." Id. In the underlying administrative decision, the ALJ relied on testimony that the claimant rakes the yard, occasionally does repairs like fixing doorknobs, visits family, and went to church. Id. at 565-66. The Fourth Circuit noted, however, that the ALJ ignored the claimant's testimony that he is constantly in pain, that he takes Darvocet for the pain, and that he lies down frequently throughout the day because of his pain. Id.

With regard to Daniel's subjective complaints of pain, the ALJ found that "[w]hile the claimant alleged rather limited daily activities in her testimony at the hearing, it would be difficult to attribute the degree of limitation alleged to her medical condition rather than other factors in view of the minimal objective medical and other evidence of record." (R. 21) The ALJ summarized the "other evidence of record" to support his assertion as follows:

> In this regard, it is noted that the claimant maintains a home and provides care for her two children. Additionally, she acknowledged that she watches the children play outdoors, drives to Lynchburg once or twice a week, and takes the children to school. On consultative examination, the claimant reported that she does light chores at home, cooks one meal daily, goes shopping with her boyfriend, and regularly visits with family and friends. The claimant's daily activities suggest a greater level of functioning than alleged and demonstrate the capacity for work at least at the sedentary level of exertion.

14

(R. 21) For these reasons the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 20)

At the administrative hearing in this matter, Daniel's testified that she could not go back to work after her car accident because "the pain is just really bad." (R. 344) She acknowledged that the medications she takes somewhat alleviate the pain, but that it never subsides completely. (R. 344) Daniel testified that resting helps her pain and that pain symptoms are greater when she engages in activities such as walking or sitting for long periods of time. (R. 344) Daniel described her typical day as follows:

> I usually wake up pretty early because I sleep off and on during the night. So I'm usually up maybe around 5:30 or 6. I usually watch the news and I sit on the couch when I do that. And then I wait until time fro my kids to wake up. They usually wake up around say 9:30 or 10 and we'll eat breakfast and then we watch TV most of the day and then I wait maybe around 4 or 5, Mike gets home from work and he usually brings dinner when h[e] come[s] in and we eat dinner, watch a little TV and then usually I'm in bed every night by 8 o'clock I'm back in bed. . . . I take breaks. I usually take at least say three or four breaks a day where I go and lay down.

(R. 345-46) Daniel testified that each break lasts thirty to forty-five minutes. (R. 346) Daniel did admit, as the ALJ notes, that she sits on the porch and watches her children play and that she drives 12 miles to Lynchburg once or twice a week. (R. 340) While Daniel's testimony provides evidence of the daily activities relied upon by the ALJ as to these two points, there is no testimony from her about driving the children to school. Such testimony came from Daniel's boyfriend of six years, Michael Overstreet ("Overstreet"), who also testified at the administrative hearing. Overstreet testified that Daniel takes one of the children to school because the school is "only

15

about a quarter of a mile" from their house. (R. 350) Overstreet, however, takes the other child to a different school because it is too far for Daniel to do on a daily basis. (R. 350)

The ALJ also references a consultative examination in his portion of the opinion discrediting Daniel's testimony about her pain symptoms. Review of this examination, however, reveals that the ALJ did precisely what the Fourth Circuit cautioned against in Hines. The ALJ "selectively cited evidence" from this consultative examination to support his conclusion. Id. at 565. The notes from the consultative examination indicate that Daniel does light chores, cooks one meal a day, goes shopping with her boyfriend, and that she visits family and friends. (R. 195) The ALJ, however, fails to take each of these activities in the proper context. For example, in terms of chores, the notes from the consultative exam reveal that "[s]he cannot mop, vacuum, perform heavy lifting, bend, stoop, squat, or run now." (R. 195) With regard to cooking one meal daily, the notes say "[s]he cooks one meal a day and the couple and her children eat out frequently because of preference and also her physical limitations." (R. 195) At the hearing, Daniel testified that she prepares breakfast for her children which consists of cereal and waffles. (R. 340) This testimony and the notes from the consultative examination are not in conflict. It is hardly apparent how the preparation of a meal consisting of cereal and waffles can be used as evidence to contradict Daniel's testimony about her pain. Certainly such "meal preparation" can be done with some amount of pain. Additionally, the ALJ points to the fact that Daniel goes shopping with her boyfriend. The notes from the consultative examination reveal that "[s]he assists her companion in shopping, but he does all of the lifting." (R. 195) Based on the actual notes from the consultative examination, it is difficult to see how the ALJ relied upon such evidence to contradict Daniel's testimony about her pain symptoms. The notes simply do not bear out any inconsistencies between her daily activities and her testimony about her pain, the need to lie down, and the pain medications

16

she takes. Accordingly, substantial evidence simply does not support the ALJ's decision to discredit Daniel's testimony about her pain symptoms based on selective evidence from her daily activities.

## V.

The Commissioner's decision requires remand for two reasons. First, the regulations, rulings and case law require that the Commissioner explain, in sufficient detail to permit meaningful judicial review, why he rejected the opinions of Daniel's treating physician. The principal rationale for rejecting this opinion relied upon by the ALJ was its inconsistency with Dr. Wombwell's treatment records. However, it is apparent from the decision that the ALJ ignored the treatment notes from the visit on the day the disability opinion was rendered. As it does not appear that the ALJ considered Dr. Wombwell's treatment notes consistent with his May 10, 2005 disability opinion, this case must be remanded. Second, the ALJ may not rely on selected portions of Daniel's daily activities as evidence to discredit her testimony about her pain symptoms, where, as here, such reliance is not supported by substantial evidence. A remand is necessary for these purposes.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the

17

Case 6:07-cv-00020-NKM-mfu    Document 22    Filed 07/22/08    Page 17 of 18    Pageid#: 88

conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to transmit a copy of this Report and Recommendation to counsel of record.

**ENTER**: This 21st day of July, 2008.

_____
Hon. Michael F. Urbanski
United States Magistrate Judge